Statement of the Case.
MONROE, C. J.
Prior to the month of November, 1908, Dr. F. F. Young appears, to have owned and conducted, in the parish of Vermillion, an establishment known as “Fen-wick Sanitarium,” in the management of which he incurred debts to the amount of about $60,000, and thereupon a corporation known as “Fenwick Sanitarium, Limited,” was organized, with Dr. Young as the principal stockholder, and the sanitarium and other properties, including, in all, nine lots of ground, in the town of Abbeville, with the *950 Improvements thereon, as also the fixtures, appliances, and appurtenances in the sanitarium proper, were sold to the corporation for the recited price of $125,000, of which $2,000 was to have been paid in cash and $63,000 in stock, and for the balance the corporation was to assume the outstanding-indebtedness of Dr. Young. The corporation, then on November 14,1909, employed Dr. Warren G. Young, a brother of Dr. F. F. Young, as “general manager,” at a salary of $3,000 per annum, “with full power and authority to employ all necessary help,” pay all bills, draw such funds as were required against the depository, and with instructions to make his deposits daily in a depository to be selected by the treasurer. The board of directors, at the same meeting, resolved that they had no funds wherewith to pay the debts that they had assumed, and authorized the general manager to negotiate for a loan, upon bonds to be issued by the company, and thereafter money was obtained from the People’s Bank by a sale of notes, issued by the company, indorsed by various persons, and secured by a mortgage, which included in the description of the property all the lots, with the buildings and improvements thereon, and the contents of the buildings, consisting of beds, bedding, surgical instruments and appurtenances, and all necessary appliances, furniture, and other things necessary to operate a sanitarium. The negotiations for the obtention of the money culminated in May, 1909, when the mortgage was executed, and certain of the notes were delivered to the bank, and on July 2, .1909, at a meeting at which Dr. F. F. Young acted as secretary, Dr. W. G. Young reported that he had been obliged to employ that gentleman as “acting manager,” at $400 per month, and tendered his own resignation as “general manager,” which was accepted. Dr. F. F. Young made a report as “acting manager,” in which he criticized the bargain that had been | made with the bank, and concludes as follows, to wit:
“If some means, I repeat, can be devised to again inaugurate the proper system of advertising, the result, financially, would be as sood as, if not better than, before. * * * The outstanding small indebtedness should be met in some manner, and, unless we can see our way to do something of the kind — as great as the loss is to me — I think it, probably, better that I tender my resignation. The great misfortune for me, personally, is that I rebuilt in Abbe-ville. Assuring- the board of directors of my high appreciation. of their efforts, I am,
“Very respectfully, F. F. Young,
“Acting Manager.”
The board ratified all that had been done with the bank and made some provision with regard to the outstanding indebtedness, but, so far from accepting Dr. Young’s resignation, elected him “active manager and secretary,” at a salary of $4,800 per annum, or $400 per month, with the use of the “home place” as a residence, but with no specific grant of authority in the matter of employing ¿elp. In November, following, there was a meeting at which the quéstion arose of allowing the president (Dr. D. L. McPherson) a salary as general manager, and of making Dr. Young medical director, but the matter was not acted on; and at a meeting in December the board was informed that the bank (which, in the transaction with it, had become the holder of a large quantity of the stock of the corporation) would not consent that Dr. Young should be paid more than $3,-600 per year as medical director, or that he should be allowed a night physician, or that he should continue to have the use of the residence, or that he should serve on the board, and the secretary was instructed to write to him and give him that information, and also to send a copy of the letter to the bank, requesting it to be explicit and positive in regard to the management of the affairs of the sanitarium company, “as [to quote the language of the motion] it is the understanding of the members of the board that the company’s policy would be dictated *952 by said bank.” Thereafter Dr. Young continued in charge of the sanitarium and appears to have managed it in his own way. In May, 1910, the bank brought this suit on certain of the obligations held by it, which had matured, and prayed for the enforcement of its mortgage, Mrs. Young intervened, asserting title (under a dation en paiement, from her husband) to the fixtures, appliances, and appurtenances contained in the sanitarium, and the matter was brought to this court by appeal and remained pending here until May, 1912, when a rehearing was refused of a judgment in favor of the bank, in which it was held that the property claimed by Mrs. Young had been included in the sale, made by her husband to the sanitarium company, and hence that his subsequent giving of it in payment to her was incompetent and inoperative. It was also held, in effect, that, inasmuch as that property was expressly included in the mortgage from the company to the bank, and as the company was making no objection to its being sold in accordance with the terms of the contract expressed in the act of mortgage, it should be so sold. People’s Bank & Trust Co. v. Fenwick Sanitarium, 130 La. 723, 58 South. 523, 43 L. R. A. (N. S.) 211, Ann. Cas. 1913C, 1322. While the suit in question was pending, Dr. Young was allowed still to remain in charge of the sanitarium and to operate it, though in March, 1911, the bank sent three of its directors to Abbeville to inquire into the condition of affairs and make some arrangement with him that would be more satisfactory to it than the then existing one appeared to be. Those gentlemen called at the sanitarium on the evening of March 13th, and, having been received pleasantly enough, made an appointment for the next day.
In the meanwhile, the president of the company had (as we find it 'recited in the minutes) called a special meeting of the board of directors, which convened after the interview with Dr. Young, and at which two of the members of the board resigned and were replaced by two of the People’s Bank directors, and then two others resigned, and their places were also filled, and the board was then reorganized, save as to the presidency,' which was retained by the incumbent. The minutes then recite the fact of the interview between Dr. Young and the gentlemen from the bank and the adjournment. The minutes of the following day (March 14, 1911) contain the recitals that the board met and repaired immediately to the sanitarium to keep the appointment as made upon the previous day; that a proposition was made -to Dr. Young that he should be employed as medical director at a salary to be agreed on; that the financial affairs of the corporation should be turned over to a person to be selected by the board, who should receive and dispose of all funds coming into the treasury ; that Dr. Young then “flew into a rage,” and broke off the negotiations, and that the members of the board retired, reconvened, and decided that, he should be called on for an accounting, and should be notified “that his continued, arbitrary occupancy and operation of the sanitarium would not longer be endured, but that he might continue to occupy the premises under a lease to be agreed upon.” It further appears that it was decided, “in view of the approaching foreclosure,” that the president be authorized to liquidate the affairs of the corporation and sell the same. Notwithstanding the decision of the board, however, nothing more was done at that time, and Dr. Young still remained in charge of the sanitarium, with apparently the same authority that he had always exercised. About three months later (on June 17th) the legal adviser of the board wrote him a letter requesting a complete statement, covering the entire period of his administration, and received a reply on the same day, in which he declined to comply *954 with the request. The counsel wrote again, on June 23d, as per instructions of the board, notifying Dr. Young that his “operation and absolute control of the property and business of the corporation was no longer desired or required,” but that he might remain in active possession and carry on Ihe sanitarium at a monthly rental of $1,500, under a lease that should be revocable at the will of the lessor. To which communication the doctor replied, on the following day, “You are either being made a fool of or are trying some humorous joke,” and remained “in active possession,” etc., without any lease; the fact being, as he testifies, that he was advised and believed that the method by which the old board of directors had been replaced by the new was wholly illegal, and hence that the so-called new board was, in legal contemplation, no board at all, and utterly without authority in the iwemises. The gentleman, highly esteemed by this court, who then represented, and still represents, the seizing creditor, was called to the stand, upon the trial of the instant case, to explain something that took place in connection with the employment, later in the year 1911, of an old German gardener and mechanic, and he testified, in part, as follows:
“Q. What about the employment of this man Koeniger, with the Interstate Bank & Trust Company [that corporation now appearing in this case as the transferee and successor of the People’s Bank & Trust Company which has gone out of existence]? A. Some time in the fall of the year 1911, F. F. Young [who was] at that time in charge of the Fenwick Sanitarium and had control of it, notified the Interstate Bank & Trust Company that he was about to move out, and that he, in fact, gave up the operation of the Sanitarium. This notice was served on me as their attorney, and I communicated with the bank, to instruct me what to do about keeping the sanitarium. I was notified to put a keeper in charge. I at once notified Mr. Koeniger that, in the event that Dr. Young did move out, for him to take charge. Mr. F. F. Young never moved out, but Mr. Koeniger assumed charge for a few days — I don’t remember how long — and was paid for his services, by me, through a draft on the Interstate Bank & Trust Company. I don’t know the amount of the draft, but I do remember that, when I made this payment, I told him that, inasmuch as Dr. Young was continuing to operate the sanitarium, the bank would not continue to employ him, and Mr. Koeniger has never made a demand on me for payment for keeping the sanitarium property. There was no need of Mr. Koeniger so long as Dr. Young was in charge of the sanitarium.”
While the sanitarium was thus allowed to be operated, a number of persons who were employed by Dr. Young, in that behalf and in various capacities, filed interventions and third oppositions in the pending suit, setting up claims for wages or salaries alleged to be due them, and asserting privileges therefor upon the movables, or upon both movables and immovables,, and an order was made under which, on June 22, 1912, the property was adjudicated (to the Interstate Bank & Trust Company, assignee of the original seizing creditor) in three parcels, to wit:
“First. The entire contents of the building known as the Fenwick Sanitarium, save and except [and here follows an enumeration of certain ‘shower baths,’ ‘needle baths,’ ‘sanitary closets,’ ‘chandeliers,’ etc., which, for some reason not explained, were excepted] for the price and sum of $3,700.
“Second. The entire block of ground known as the Fenwick Sanitarium, * * * with all buildings and improvements thereon. Also another certain parcel of ground, * * * with all buildings and improvements * * * for the price and sum of $15,000.
“Third. That certain block * * * known as the residence block * * * with all buildings * * * ; also lots [designating certain lots in ‘F. F. Young’s addition’] for the price and sum of $6,000. * * *
“Making a total of $24,700.”
After the sale, there was a trial of the oppositions, and the trial court rejected the demands of all the opponents, except Mrs. Marie Broussard and Conrad Koeniger, to whom, respectively, it awarded $142 and $509.70. The opponents whose demands were thus rejected have appealed (with the exception of Josephine M. Greiner), as has, also, the bank; and Mrs. Broussard has answered the appeal, praying that the award in her favor be increased.
*956 The claims thus set up by way of opposition are as follows:
1. Mrs. Noemi Young, wife of Dr. F. F. Young, as transferee, under dation en paiement, of a claim of her husband, for salary as manager for one year, preceding May 10,1912.. $4,800
2. Frank Fenwick Young, Jr........ 200
3. A. Laurie Young................ 2,075
4. J. Dalton Young................ 1,125
5. H. A. Eldridge, transferee of S. P. Watts ...,..................... 858
6. Miss Idolie Trahan............. 50
7. Mrs. Marie Broussard........... 290
8. Conrad ICoeniger.......:....... 889' 70
There is in evidence a dation en paiement from Dr. Young to his wife, of date May 10, 1912, which includes a claim on his part against the sanitarium for salary to the amount and for the period as claimed by Mrs. Young. The other opponents testify to the correctness of their respective claims, and are corroborated by Dr. Young. There is also in evidence a written instrument, of date December 11, 1911, signed, “Fenwick Sanitarium, Limited, per F. F. Young, Business Manager,” and bearing the signatures of Albert Laurie Young, Francis Fenwick Young, Jr., M. D., Seaborn P. Watts, and Mrs. Marie Broussard, which contains the recital that the parties last above named were employed for one year from the date of the instrument in the several capacities and at the several salaries, as follows, to wit: Albert Laurie Young as “chief clerk,” at $1,800 per annum; Francis Fenwick Young, Jr., M. D., as “assistant manager and assistant physician,” at $2,400; Seaborn P. Watts, as “secretary,” at $1,200; Mrs. Marie Broussard, as “matron,” at $360. D. L. McPherson, president of the defendant company, testifies that the board of directors did not meet at the sanitarium because the members did not want to have any unpleasantness with Dr. Young; that the board was not kept informed by Dr. Young of the financial affairs of the institution of which he and his assistants were in entire control; that no demand was made upon him for an accounting; that the board was not consulted about the appointment of the several secretaries, clerks, etc., and that one man could easily have done all the work, including the keeping of the books; that the board, as a whole, was never consulted about the selection of a depository; that he does not know where the funds of the company were deposited; that he knew that Watts and Miss Trahan were working at the sanitarium, and that J. D. Young was living there, but that he had no knowledge of his being employed; that the affairs of the sanitarium were left in the hands of Dr. W. G Young, and when his term expired, that Dr. F. F. Young was chosen manager; that, at the expiration of his term, he was not re-employed; that his term expired when he resigned, as shown by the minutes.
Opinion.
It is beyond dispute that Dr. Young was elected “active manager and secretary” of the sanatarium company, on July 2, 1909; that he never resigned the position of “active manager,” and never abandoned it until about the time of the sale of the property, on June 22, 1912; and that, so far as the public at large were concerned, he held himself out, and was allowed by the owner and by the principal creditors (People’s Bank and its assignee, the Interstate Bank) to hold himself out as vested with authority to manage according to the dictates of his own judgment. A,s between Dr. Young and the parties mentioned, however, the action taken by the board of directors of the company, on December 18, 1909, sufficiently indicates that he was not authorized (after that date, at all events) to create and fill salaried offices, and hence that such appointments as were thereafter made by him were made without authority, and were not binding upon the owner of the property or the creditors with respect to appointees who' knew that their appointments were unau *958 thorized, or to whom such knowledge may reasonably be imputed. As to those persons who were retained by Dr. Young, and those who may subsequently have accepted employment in good faith, we are of opinion that the owner and creditors are bound to the extent that they (employes) are entitled to such privilege for their wages or salaries as the law accords to persons occupying their positions, because, although at one time Dr. Young was notified that his services were no longer required, the owner and creditors acquiesced in his remaining in charge, as the extensible manager of the property, and we are satisfied that they did so from motives of interest, and in order that, by keeping it open as a going sanitarium, it might bring a better price when offered for sale under the prospective writ of execution. We then proceed to the consideration of the claims of the opponents, respectively, as follows, to wit:
1. The claim of Mrs. Noemi Young.
The act, whereby Dr. Young assumes to give in payment to his wife his claim against the sanitarium company for one year’s salary, amounting to $4,800, was executed a few days after this court had refused the rehearing in the case in which Mrs. Young’s claim, under a previously executed act, had been rejected, on the ground that it purported to convey property that the donor had already conveyed to the company, and it indicates, as does Dr. Young’s course, in other. respects a persistent .effort on his part to recoup himself with respect to what he seems to have believed was a hard bargain, of which he was, in some sort, the victim. But he could not donate that which did not belong to him, and, in view of the fact that, from July 2, 1909, he received, in a fiduciary capacity, all the revenues inuring to the sanitarium company, disposed' of them as he thought proper, and has accounted for none, we are unable to say that, when he executed the dation en paiement to his wife, or now, he had or has any claim against that company for salary. We may say, in this connection, however, that we do not concur in the view, expressed by the counsel representing the intervening bank, that “no movable property was sold,” or that the opinion heretofore handed down by this court (130 La. 723, 58 South. 523, 43 L. R. A. [N. S.] 211, Ann. Cas. 1913C, 1322) can properly be construed as holding, either that movable property is susceptible of mortgage, or that the appliances and appurtenances, constituting the contents of the sanitarium, had become immovable by destination. What the court, in effect, decided was that those appliances and appurtenances, having been sold by Dr. Young to the sanitarium company, were not susceptible of being thereafter given in payment by him to his wife, and that, inasmuch as the sanitarium company had mortgaged the whole property, specifically including (whether properly or improperly) the appliances and appurtenances in question, and the company was interposing no objection to their being sold, in enforcement of the contract expressed in the act of mortgage, there was no good reason why they should not be so sold. But that ruling did not determine that they were immovables, or were subject to the mortgage, even as to the parties who were before the court, and still less as to< interested parties who were not before the court; and we now hold, as to such parties, that they were not immovables, by destination or otherwise and were not subject to the mortgage, and that they were properly sold separately, and as movables.
2. Frank Fenwick Young, Jr., claims $200 for services alleged to have been rendered as “assistant manager and assistant physician” for the month beginning December 11, 1911 Laurie Young claims $2,075, as balance alleged to be due for services as “chief clerk” *960 from January 1 to March 31, 1911, at $60 per month, from March 31 to December 1% 1911, at $125 per month, and from December 11, 1911, to May 31, 1912, at $150 per month J. Dalton Young claims $1,125 as balance alleged to be due for services as clerk, from January 1, 1909, to December 1, 1911, at $100 per month, and from December 1, 1911, to September 30, 1912, at $150 per month.
The parties thus named are the sons of Dr. Young, and resided with their father. The judge a quo rejected their claims, in toto, upon the ground, in effect, that they were not employed, and did not accept employment, in good faith, but that, if employed at all, it was with knowledge of the existing conditions and with a view to the imposition of a burden, or charge, upon the property which would have to be sustained by the seizing creditor, who was the Egyptian to be despoiled; and we concur in that view partially, but not altogether.
Dr. Frank Fenwick Young, Jr., was a young graduate, who had not yet passed his examination before the State Board of Medical Examiners. His employment was at a period when the affairs of the sanitarium were at a very low ebb, and was directly in contravention of the action which had been taken by the board of directors in December, 1909. It appears that, upon the •day that he was employed (December 13, 1911), the idea was conceived that a written contract of employment might be entered into, which, when recorded, would entitle the parties thereto to a privilege upon both the movable and immovable property of the company for the compensation therein stipulated. Dr. Young, Junior, was therefore employed for one year at a salary of $2,400; Albert Laurie Young was employed for the same period at $1,800, being an advance of $25 per month upon the salary that he is said to have earned, but not received, for some months prior to that time; J. Dalton Young was employed at $150 per month, for the year, being an advance of $50 per month, upon the salary that he is said to have been earning, but not receiving; and Seaborn P. Watts was employed as secretary at $1,200 per annum, being an advance of $50 per month upon the salary that he had been earning, and the most of which he had received; Mrs. Broussard was also employed at $360 for the year, being the salary for which she had previously been working, and a good part of which had not been paid. By comparison of the amounts claimed by those opponents with the salaries for which they are said to have been working, it appears that, at the date of the contract in question, when those salaries were thus increased, there were probably due to the opponents rather heavy balances of unpaid salaries, and it was obviously a bad time for the increases; for if (as in the case of Mr. Watts, for instance) an employé is unable to collect a salary of $50 per month because his employer is unable to pay it— which is the reason that the opponents assign — of what avail is it to increase the salary, unless it be with the idea of shifting the entire burden to other shoulders and thereby recouping the loss. The relations of the opponents to their father, as his sons, and to the business, as assistant manager, chief clerk, and clerk, were presumably intimate, and we concur in the view of the judge a quo that they must have been acquainted with the situation, and must have known that the creation of new positions and the increase of salaries, after the company had passed under the control of its principal creditor and after that creditor had brought suit to enforce its claim, by sale of the property, was unauthorized. And we reach this conclusion the more readily thrt the parties in interest appear to have been about as reticent, upon the trial of the case, as to the business of the company and the *962 necessity or propriety, of their employment, as ‘Dr. Young had been before the trial. J. Dalton Young, however, appears to have been employed as clerk at $100 per month in January, 1909, and we think that he should be awarded the balance due him, upon crediting his salary at that rate and deducting from the amount claimed the increase of $25 per month from December 1; 1911, which would make the amount to be recovered $875.
3. H. A. Eldridge, as transferee of S. P. Watts, claims $858.10, for services as secretary and clerk, from January 1, 1910, at $50 per month, and Mr. Watts says, in his testimony, that Dr. Young told him at one time, when he protested, that $50 was not in accordance with his understanding; that “he had told the People’s Bank & Trust Company that he was paying me [the witness] $50 per month,” which leaves no doubt as to Mr. Watts’ information as to the extent of Dr. Young’s authority. We, therefore, conclude that the opponent is entitled to recover the amount claimed, less the increase, at the rate of $50 per month from December 11, 1911, to May 31, 1912, or, $570.44.
4. Idolie Trahan, was employed as stenographer, and we are satisfied was entirely innocent of any collusion to the prejudice of the-seizing creditor.
5. We are of the same opinion in regard to Mrs. Marie Broussard.
6. The claim of Conrad Koeniger is also sustained to the extent allowed by the district court.
It is therefore adjudged and decreed that the judgment appealed from be amended by allowing the claim of J. Dalton Young, to the amount of $S75, and of H. A. Eldridge, to the amount of $576.44, each with the privilege accorded to clerks upon the fund in the registry of the court. It is further decreed that, as amended, said judgment be affirmed, and that the costs of the appeal be paid in equal proportions by all the appellants save those in whose favor the judgment has been thus amended.